FILED

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

02 SEP 26 PM 3: 20

U.S. DISTRICT COURT
N.D. OF ALABAMA

ALYCE D. BROWN,                          }
                                         }
    Plaintiff,                       }
                                         }
v.                                       }        CASE NO. CV 00-B-0904-NW
                                         }
BOARD OF TRUSTEES FOR THE                }
UNIVERSITY OF NORTH ALABAMA,             }
                                         }
    Defendant.                       }
                                         }

ENTERED

SEP 26 2002

## MEMORANDUM OPINION

Currently before the court is the Motion for Summary Judgment filed by defendant University of North Alabama Board of Trustees' ("the Board" or "defendant"). Plaintiff, Dr. Alyce Brown, an Associate Professor in the College of Nursing and Allied Health at the University of North Alabama ("UNA"), filed this action claiming that she was denied promotion to the rank of Professor during the 1998-1999 academic year because of her race in violation of Title VII of the Civil Rights Act of 1964. She also claims that the Board violated Title VII by subjecting her to a racially hostile work environment and retaliating against her because she had filed an EEOC charge in 1994. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, this court is of the opinion that the Board's Motion for Summary Judgment is due to be granted.



## I. STATEMENT OF FACTS

**A.     Plaintiff's Employment with UNA and Her Allegations Against the School**

Dr. Alyce Brown began working for UNA as an instructor in the College of Nursing in the 1970s, and she was promoted to the position of Assistant Professor in 1975. (Brown Dep. at 92-93.) In 1994, Dr. Brown filed an EEOC charge after she was denied promotion to the position of Associate Professor, and, soon thereafter, she agreed to dismiss her charge in exchange for the promotion. (*Id.* at 94, 125.) All of her claims related to that charge were resolved. (*Id.* at 125.)

In the Fall of 1998, Dr. Brown applied for promotion to the rank of Professor. (*Id.* Ex. 8A.) In the Spring of 1999, she learned she would not receive a promotion that year, and on June 22, 1999, Dr. Brown filed an EEOC charge alleging race and sex discrimination and retaliation. (*Id.*) In that charge, she alleged, "I have been subjected to different terms and conditions of employment with respect to job assignments, promotions, harassment, leave policy and intimidation." (*Id.*) After the EEOC dismissed her charge and notified her of her right to sue, Dr. Brown filed a sixteen-page complaint in this action, describing a multitude of incidents that allegedly provided the basis for her suit. The court *sua sponte* ordered plaintiff's counsel to file an Amended Complaint in compliance with Fed. R. Civ. P. 8(a), 10(b), and 11(b). (Order of September 19, 2000.)

Plaintiff's counsel[1] filed an Amended Complaint on October 2, 2000. In her Amended Complaint, Dr. Brown asserts three claims under Title VII: (1) a retaliation claim; (2) a race discrimination claim; and (3) a racially hostile work environment claim. (Am. Compl. ¶¶ 39, 43-

---

[1] Dr. Brown was initially represented by Ouida Brown and Danita T. Haskins, but Ms. Haskins filed a Motion to Withdraw at approximately the same time the Amended Complaint was filed, stating she needed to withdraw because a "conflict has arisen." (Haskins's Mot. to Withdraw.) That motion was granted by Order entered October 23, 2000.

47, 54.) Plaintiff's Amended Complaint does not differentiate between the employment actions alleged to have been racially motivated and those alleged to have been in retaliation for her EEOC charge. Liberally construing the Amended Complaint, the court analyses herein the alleged adverse employment actions under both theories of liability.

## B.    Alleged Incidents of Harassment

Dr. Brown alleges that she was harassed by three employees at UNA: Dr. Frenesi Wilson, the Dean of the College of Nursing; Professor Susan Bobeck; and Phyllis McGuire, Dean Wilson's secretary. (Brown Dep. at 244-45.) Dr. Brown also alleges that some unidentified faculty member, unbeknownst to her, watched her office door to see if she complied with her posted office hours. (*Id.* at 75-76.)

### 1.    Alleged Harassment by Dean Wilson[2]

Dr. Brown has never heard Dean Wilson make any derogatory comments about her race or her filing of an EEOC charge, however, Dr. Brown complains about several incidents of "harassment" involving Dean Wilson.  (*Id.* at 126).

During the Fall semester of 1998, Dr. Brown sent some nursing students to a clinic for a field study at a time when the clinic was closed.  (*Id.* at 44-45, 274; Complaint ¶ 29.)  Dr. Brown claims this incident was a "misunderstanding in the communication" that led her to send the students to the clinic at the wrong time.  (Brown Dep. at 45.)  Dean Wilson allegedly pointed her finger at

---

[2]Although Dr. Brown accuses Dean Wilson of harassing her in violation of Title VII, she testified that they had "a good working relationship," and they were courteous and respectful to each other. (Brown Dep. at 100-01.)   Dean Wilson recommended Dr. Brown for promotion on at least one occasion; accommodated Dr. Brown's schedule to allow her to take care of her sick mother; and assisted with the scheduling of classes for Dr. Brown's daughter, who suffered from seizures. (*Id.* at 95-97, 103-04.)

Dr. Brown during a discussion about the incident and said the students should not be sent to the clinic when it was closed. (*Id.*) Dr. Brown did not receive a reprimand or any other disciplinary action as a result of this incident. (*Id.* at 48.) After her conversation with Dean Wilson, Dr. Brown rescheduled the student visit for a time when the clinic was open. (*Id.*)

On November 12, 1998, Dean Wilson told Dr. Brown she "was not being available to the students." (*Id.* at 215.) Students often complained to Dean Wilson that Dr. Brown was not available during her posted office hours. (Wilson Decl. ¶ 10.) Dean Wilson told Dr. Brown that "things were going to change and it was all about clinical placement." (Brown Dep. at 216-17.) Dr. Brown could not recall anything else that was said during this discussion. (*Id.* at 216.)  No disciplinary action was taken against Dr. Brown as a result of this issue. (*Id.*)

According to Dr. Brown, Dean Wilson harassed her in September 1998, when he asked her not to assign her class any outside reading materials that could not be obtained in the school library. (*Id.* at 256, 277-78.) Dr. Brown also believed she was being harassed because she could not attend faculty meetings when her clinicals overlapped with the meeting times, despite the fact that Dean Wilson gave her and all professors permission to let their students out of class early to attend a meeting. (*Id.* at 257; Wilson Decl. ¶ 7; Davis Decl. ¶ 6.)

**2.    Alleged Harassment by Professor Susan Bobeck**

In 1994 or 1995, Dr. Brown worked on a committee chaired by Professor Sue Bobeck. (Brown Dep. at 245-49.) Dr. Bobeck became frustrated with Dr. Brown after she failed to complete a committee project assignment in a timely manner. (*Id.* at 245-47.) Dr. Bobeck told Dr. Brown to stay past 4:00 p.m. that day to complete her assignment and to consider going part-time if she could not complete her work in a timely manner. (*Id.* at 246.) Dr. Bobeck later sent Dr. Brown an e-mail

that which stated that "everybody was doing their job . . . and you're not." (*Id.* at 246-47.) Dr. Brown has not had any further problems with Dr. Bobeck since this incident in 1994 or 1995. (*Id.* at 249.)

### 3.    Alleged Harassment by Phyllis McGuire

Dr. Brown claims she was harassed by Phyllis McGuire, secretary to Dean Wilson. According to Dr. Brown, Ms. McQuire harassed her by referring to her failure to respond to her beeper. (*Id.* at 253.) On one occasion, Ms. McGuire tried to reach Dr. Brown on her beeper, but Dr. Brown either turned her beeper off, did not have her beeper with her, or had not replaced the batteries. (*Id.* at 250-51.) Ms. McGuire told Dr. Brown the beeper operated on batteries and volunteered to replace the batteries for her, but Dr. Brown refused because she did not want to drive over simply to pick up a battery. (*Id.* at 251.)   Dr. Brown was not reprimanded or subjected to any disciplinary action for failing to respond to her beeper. (*Id.*) Dr. Brown says she was also harassed in April 1998 when Ms. McGuire put a note under her door stating she had missed a meeting with a student. (*Id.* at 169-70, 179.)

### 4.    Plaintiff's Allegations of an "Attack" Against Her

In December of 1997, Dr. Brown was told of an "attack" against her. (*Id.* at 73-76, 82.) Dr. Brown alleges that her office "door was being watched" by one or more unidentified faculty members because she spent time with her family and church and because she kept her office door closed most of the time. (*Id.* at 76, 81-83.) The "attack" consisted of watching Dr. Brown's door to monitor her compliance with her posted office hours. ( *Id.* at 76, 85.) Dr. Brown testified that "to [her knowledge, she] had no problem with anybody and to [her knowledge, she] didn't know that anybody had any problem with [her]." (*Id.* at 87.)

## C.   Alleged Discrimination in Job Assignments

Dr. Brown also claims she was discriminated against in her teaching assignments. (*Id.* at 184.)  She felt her clinical assignment was moved unfairly from Helen Keller Hospital beginning in November 1997,[3/] and that she was removed from the Nursing Leadership and Management class ("Nursing 411") after the 1999 Spring semester. (*Id.* at 184-85.)

UNA offered two Nursing 411 classes during the Spring of 1999.  (Davis Decl. ¶ 9.)  Dr. Brown taught the 411 section offered to students seeking both their Registered Nurse ("RN") certification and their B.S. in Nursing (the generic class), while Dr. Ernestine Davis, an African-American female, taught the Nursing 411 section offered to students who had already attained their RN certification, but were still seeking a B.S. in Nursing.  (*Id.*)  After the 1999 Spring semester, Dean Wilson removed Dr. Brown from the generic Nursing 411 class because her students had complained of having difficulty understanding the material presented by Dr. Brown, her students had poor scores on the RN Certification tests in the areas covered by Dr. Brown's class, and Dr. Brown repeatedly failed to update her course curriculum despite being asked to do so for two years. (*Id.*; Wilson Decl. ¶ 10.)

Dr. Brown admits that she had received some poor evaluations from students of the Nursing 411 class and that an outside accreditation committee had criticized her Nursing 411 course curriculum as outdated. (Brown Dep. at 39-40, 42.)  Dr. Davis replaced Dr. Brown as instructor for the generic Nursing 411class. (*Id.* at 225-26.)  One of the primary complaints by students was that Dr. Brown was not available to them. (Wilson Decl. ¶ 10.)  Dean Wilson hoped that placing Dr.

---

[3/]Dr. Brown admits that she was notified in November 1997 of the decision to change her clinical assignment. (Brown Dep. at 214.)   Any claim based on this change in job assignments is time barred.

Brown in a clinical setting, where she would work directly with the students, would allow her to improve in this and other performance areas. (*Id.*)

While Dr. Brown believes her removal from the Nursing 411 teaching assignment was unfair, she acknowledges that white professors had been given assignments without classroom teaching responsibilities. (Brown Dep. at 236-38.) Although Dr. Brown suggests that instructing students in the clinical setting is not a form of teaching, (*Id.* at 234-35), Dean Wilson testified without dispute that, in the nursing field, clinical instruction is considered as important as classroom instruction and that faculty members in clinical and classroom assignments are governed by the same promotion criteria and have the same prospects for promotion. (Wilson Dep. at 17, 75; Wilson Decl. ¶ 10.)

**D.     Plaintiff's Denial of Promotion to the Rank of Professor**

Dr. Brown claims she was denied a promotion to the rank of Professor in the 1998-99 school year based on her race. (Brown Dep. Ex. 8A.) Three current faculty members in the College of Nursing, excluding Dean Wilson, have been promoted to the rank of professor. (Davis Decl. ¶ 8.) Two of three faculty members are African-American. (*Id.*) Dean Wilson recommended the promotion of both African-American faculty members to the rank of full Professor. (Wilson Dep. at 8-10, 37-38.)

**1.     The Promotion Selection Process**

UNA's Faculty Handbook requires applicants to meet the following criteria in order to be eligible for promotion to the rank of Professor:

> Possession of the doctor's degree or terminal degree appropriate in the field of assignment as determined by university policy and a minimum of 12 years of appropriate cumulative experience. In addition, *the appointee shall have established*

> *a record of excellence in teaching, in service to university, community, profession,*
> *and in scholarly or creative performance.*

(Brown Dep., Ex. 10 at 2 (emphasis added).)   Within the College of Nursing, the Retention,

Recruitment, and Promotion Committee ("RRP Committee") is responsible for making promotion

recommendations to the Dean of Nursing. (*Id.* at 134-35.) Dr. Davis, a close friend of Dr. Brown,

has chaired  the committee for fifteen years. (*Id.* at 134-35; Davis Decl. ¶ 3.) Dr. Brown has not

offered any evidence of a discriminatory motive by Dr. Davis or her committee.

The RRP committee reviews applicants' portfolios and makes a written recommendation to

the Dean as to the degree of qualification ("highly," "moderately," or "less qualified") of each

applicant for promotion. (Davis Decl., Ex. 1 at 3.) After conducting an independent review of the

applicants' portfolios, the Dean forwards the committee's recommendation, together with her own

recommendation, to UNA's Vice President for Academic Affairs. (*Id.*) Based upon these

recommendations, the Vice President and the President compile a list of proposed promotions, and

the President, from this list, makes the final promotion decisions. (*Id.*)

### 2.      The RRP Committee Determination of Qualifications

The RRP Committee met on November 12, 1998, and reviewed the portfolios for two

applicants:  Dr. Brown and Dr. Lavin Rowe (white). (Davis Decl. ¶ 5.) Dr. Brown sought

promotion to the position of Professor, and Dr. Rowe sought promotion to the lower position of

Associate Professor. (*Id.*) The committee noted the following strengths and weaknesses of the

applicants in light of the criteria described in the Faculty Handbook:

**Dr. Brown:**

> Teaching Effectiveness:  Course modification was evidenced; Some outdated material
> remains in course packet; Unable to identify new course development/implementation;

8

Letters from graduates showed Dr. Brown to be a kind and loving person; Missed office hours and often late; No student evaluation reviews noted or summarized.

Scholarly or Creative Performance: No current publication/research noted; Has presented at Helen Keller Memorial Hospital.

University or Community Service: Missed meetings and/or late attending College of Nursing meetings; Shows high involvement in community service; Highly involved on the National level in community service related to church; Participates on University committees.

**Dr. Rowe:**

Teaching Effectiveness: Evidence of course modification and changes; Student evaluations were summarized by percentage: Showed effective teaching; Research and publication in last five years; Participates and completes committee assignments.

Scholarly or Creative Performance: Completed DSN.

University or Community Service: Actively participates on University and College of Nursing committees; Involvement with community activities.

(Davis Decl. ¶ 5, Ex. 3.)

The RRP Committee also scored each applicant in these three areas with ratings of "high," "moderate," or "low." (Davis Decl. ¶ 5, Ex. 5.)  Dr. Rowe received better ratings than Dr. Brown. (*Id.*)  Dr. Rowe received 43 votes in the "high" category, 19 votes in the "moderate" category, and 2 votes in the "low" category. (*Id.*)  Dr. Brown received only 13 votes in the "high" category, 29 votes in the "moderate" category, and 21 votes in the "low" category. (*Id.*)

**3.     The Promotion Decisions**

Dr. Davis submitted the RRP Committee's recommendation to Dean Wilson by memorandum dated November 17, 1998. (Davis Decl. ¶ 5, Ex. 3.)  Based on the votes, the Committee recommended Dr. Rowe as "highly qualified" for promotion, and recommended Dr. Brown as only "moderately qualified" for promotion. (*Id.*)

9

Dean Wilson agreed with the Committee's findings and with the Committee's decision to recommend Dr. Rowe as more qualified for promotion than Dr. Brown. (Wilson Decl. ¶¶ 7-8.) Dean Wilson knew of Dr. Brown's performance problems, such as being late or absent from meetings, failing to update her course material, and receiving poor evaluations from students. (*Id.* ¶ 7.) She was familiar with Dr. Rowe's work and considered her qualified for promotion to the rank of Associate Professor. (*Id.* ¶ 6.) Dean Wilson knew that due to budgetary restraints the College of Nursing would likely receive only one slot for promotion. (*Id.* ¶ 4.) Based on these considerations, Dean Wilson recommended Dr. Rowe as "highly recommended" for promotion, and she did not recommend Dr. Brown for promotion. (*Id.* ¶ 8, Ex. 5.) Dr. William Strong, the Interim Vice-President for Academic Affairs, conducted an independent review of Dr. Brown's portfolio and concurred with Dean Wilson's recommendation that Dr. Brown should not be promoted. (Strong Decl. ¶¶ 3-5.) President Potts followed these recommendations, and Dr. Rowe was awarded the only promotion in the College of Nursing that year. (Potts Decl. ¶ 3.)

### 4.   Plaintiff's Argument with the Promotion Decisions

Dr. Brown has conceded  many of the flaws identified in her application by the  RRP Committee. She admitted she had not done research in the field of nursing since 1994 and that she had not published any articles of substance in her field. (Brown Dep. at 149-50.)  By contrast, Dr. Rowe  had recently engaged in research and publication, including the publication and defense of her dissertation only a year earlier. (Wilson Decl. Ex.3.)  Dr. Brown also admitted her "students gave low evaluations of her teaching," but claims the poor evaluations were a result of Dean Wilson's harassment. (Am. Compl. ¶ 25.)

10

Unlike Dr. Rowe, who provided evidence of effective teaching through the results of her student evaluations, Dr. Brown chose not to submit any student evaluations with her portfolio. (Brown Dep. at 146.) Dr. Brown believes students should not be used to evaluate whether a teacher has shown excellence in teaching. (*Id.* at 140-42.) In addition, Dr. Brown opined that none of the members of the RRP committee were qualified to evaluate her teaching ability because they had not attended her class for an entire semester. (*Id.*)

Despite the fact that Dr. Rowe sought promotion to a lower rank than Dr. Brown, Dr. Brown says she is as qualified for promotion as Dr. Rowe, despite the fact that she was unfamiliar with Dr. Rowe's qualifications. (*Id.* at 152-54, 183-84.) Dr. Brown asserts she was entitled to a promotion based on her work performance and her years of service and teaching. (*Id.* at 161, 223.)

Although Dr. Brown contends the denial of her promotion was discriminatory, she is unsure whether the discrimination was intentional. She testified, "[d]iscrimination is a thing that is probably hard to call, and a lot of times when you're doing it you don't – you may not recognize you're doing it. It's the recipient of the discriminatory acts of prejudice that knows it." (*Id.* at 120-121.) She does not state definitively why she has been treated differently. (*Id.* at 107.) According to Dr. Brown perhaps it was her race, perhaps her age, but "I just know that . . . I've been treated differently." (*Id.*)

**E.   Plaintiff's Allegations Related to Leave Policies**

Dr. Brown alleges that the department secretary's completion of leave forms for Dr. Brown to sign that correctly reflected her absences in the Spring of 1998 constituted race discrimination and retaliation. (*Id.* at 175, 180.) All UNA employees are required to complete leave forms when they miss work, and Dr. Brown admitted she would occasionally forget to complete the forms. (*Id.* at 28-

29, 176.) Dr. Brown does not know whether the secretary completed the forms for other professors. (*Id.* at 176-77.) She admits that she was absent on the day that the secretary had completed the leave forms, and she does not contend she was denied any leave she had requested. (*Id.* at 173, 176-77.) Plaintiff has not been reprimanded or otherwise disciplined for missing office hours. (*Id.* at 79-80.)

## II. DISCUSSION

The Board is entitled to summary judgment on plaintiff's claims. First, most of plaintiff's claims are time-barred. But even if her claims are not time-barred, plaintiff does not offer sufficient evidence that the alleged adverse employment actions were taken against her because of her race or because she had filed an EEOC charge. Most of plaintiff's claims are based on incidents that do not rise to the level of substantiality necessary to support a discrimination or retaliation claim. The only true adverse employment action about which Dr. Brown complains is the Board's failure to promote her to the position of Professor. However, plaintiff has failed to present evidence rebutting defendant's legitimate, non-discriminatory reasons for denying her a promotion. For these reasons, the Board is entitled to judgment as a matter of law.

### A.   Most of Plaintiff's Claims Are Time-Barred

Title VII requires an aggrieved party to file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred. 42 U.S.C. §2000e - 5(e); *Thomas v. Kroger Co.,* 24 F.3d 147, 150 (11th Cir. 1994) ("Title VII expressly states that an employee must file a charge of discrimination with the EEOC within 180 days after the alleged discrimination in order to maintain an action under the Act."). Dr. Brown's EEOC charge is dated June 22, 1999. Thus, any claims based on conduct that predates December 19, 1998, 180-days

before she filed her EEOC charge, are untimely and due to be dismissed.  Most of the incidents about which Dr. Brown complains occurred far before the 180-day period.  There are only a few incidents that may have occurred within the 180-day period:  the alleged harassment by Phyllis McGuire when she volunteered to replace the batteries in Dr. Brown's beeper; Dr. Brown's reassignment to clinical instruction after the Spring 1999 Semester; and her denied promotion to the position of Professor during the 1998-99 school year.  The alleged harassment by Sue Bobeck took place in 1994 or 1995;  removal of plaintiff from the Helen Keller Hospital took place in November of 1997; the alleged door watching "attack" took place before December of 1997; the incident in which the secretary placed the note under her door and completed leave forms for her took place in the Spring of 1998; and, the alleged harassing conduct by Dean Wilson (i.e., the finger pointing incident, the "things are going to change" incident, her scheduling conflict with faculty meetings) took place in the Fall of 1998.  Any claim based on these incidents must be dismissed as time-barred.  *See Thomas*, 24 F.3d at 150.  Therefore, defendant's motion for summary judgment is due to be granted as to these claims and such claims are due to be dismissed as time-barred.[4]

**B.    Plaintiff's Promotion Claim**

        Dr. Brown claims she was denied promotion to the rank of Professor because of her race. (Am. Compl. ¶¶ 43-47.)   In this case there is no direct evidence of discrimination.  Therefore, the court's analysis is governed by the tripartite framework established by the Supreme Court in

---

[4] Plaintiffs claims regarding the alleged harassment by Phyllis McGuire when she volunteered to replace the batteries in Dr. Brown's beeper; Dr. Brown's reassignment to clinical instruction after the Spring 1999 Semester; and her denied promotion to the position of Professor during the 1998-99 school year are not time-barred.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If defendant succeeds in carrying this burden, then plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives, in this case, race discrimination or retaliation. *Burdine*, 450 U.S. at 253. At all times, plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998).

### 1.     Plaintiff's *Prima Facie* Case

To establish a prima facie case of Title VII race discrimination with regard to a promotion decision, a plaintiff must prove: (1) she is a member of a protected class; (2) she was qualified and applied for promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who are not members of the protected class were promoted. *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000), *cert. denied*, 532 U.S. 958.

Dr. Brown, as an African-American, is a member of a protected class, she met the minimum qualifications for promotion to the rank of Professor, she applied for promotion, and she was

14

rejected.   However, Dr. Brown has not proven that other equally or less qualified non-minority employees were promoted to the position she sought: Professor. Dr. Rowe, the only individual to whom Dr. Brown compares herself, did not receive a promotion to Professor, but to the lower rank of Associate Professor, which was the position Dr. Brown already held.  Therefore, plaintiff fails to establish a prima facie case of discrimination.

Assuming plaintiff and Rowe are comparators, the court also finds that plaintiff has not demonstrated that she was equally or more qualified than Rowe for a promotion.  Defendant has presented evidence that the RRP Committee rated the two applicants for promotion and found that Rowe was more qualified for a promotion than plaintiff.  Plaintiff did not submit evidence sufficient to rebut this assertion.  Plaintiff's deposition testimony indicates that she believed she and Rowe were equally qualified for promotion, despite no knowledge of Rowe's qualifications.

### 2.   UNA's Legitimate, Non-Discriminatory Reasons for the Promotion Decision[5]

Even assuming that plaintiff proved a prima facie case, she has failed to present evidence to dispute defendant's legitimate, non-discriminatory reason for failing to promote her to full Professor. Defendant's promotion procedure provides clearly defined criteria with multiple layers of review. To be promoted to the rank of Professor, "the appointee *shall have* established a record of excellence in teaching, in service to university, community, profession, and in scholarly or creative performance."  (Brown Dep., Ex. 10 at 2 (emphasis added).)  In order to be considered for

---

[5]   To the extent plaintiff's Amended Complaint could be construed as asserting a retaliation-based promotion claim, such a claim must fail for the same reasons as her race-based claim. *See Gupta v. Florida Board of Regents*, 212 F.3d 571 (11th Cir. 2000)(directing that judgment be entered in favor of the employer on retaliation claims where employee failed to dispute employer's legitimate, non-retaliatory reasons), *cert. denied*, 531 U.S. 1076 (2001).

promotion, Dr. Brown had to demonstrate to her peer committee, the Dean, the Vice-President of Academic Affairs, and the President that she had an established record of excellence in these areas.

The evidence before the court is that the RRP Committee conducted a detailed examination of the portfolios of both Dr. Brown and Dr. Rowe, rated their applications based on legitimate criteria, and ultimately concluded Dr. Rowe should be given a preferable recommendation for promotion. Dean Wilson and Dr. Strong also conducted independent reviews of the applicants' portfolios and found that Dr. Rowe was more qualified than Dr. Brown for the promotion opportunity available in the College of Nursing.

Dr. Brown admits she has never published any significant works in her field; she has not conducted research since 1994; and she received poor evaluations from her students. (Brown Dep. at 149-50; Am. Compl. ¶ 25.) These facts were the very reasons that led to Dr. Brown being passed over for promotion. (Davis Decl. ¶ 6; Wilson Decl. ¶¶ 4-6; Strong Decl. ¶ 3.)   Dr. Brown has not presented sufficient evidence on which a reasonable jury could find that the Board's legitimate, nondiscriminatory reasons for selecting Dr. Rowe for promotion are pretextual.

Dr. Brown admits she received poor evaluations from students regarding the effectiveness of her teaching and she did not include student evaluations in her portfolio. (Am. Compl. ¶ 25; Davis Decl., Ex. 5.) In contrast, Dr. Rowe's portfolio contained student evaluations, summarized by percentages, which the Committee found evidenced effective teaching. (Wilson Decl., Ex. 3.) Dr. Brown admits that her curriculum had been criticized by an accreditation agency as outdated. (Brown Dep. at 39-40.) Further, the students in Dr. Brown's Nursing 411 class had scored poorly on their RN certification tests in the areas covered by her class. (Wilson Decl. ¶ 10.) Plaintiff's own evidence corroborates this finding. Dr. Brown submitted "diagnostic profiles" from the "NCLEX"

16

tests for students that show that the area covered by her 411 class, "Management of Care," reflected a need for "a moderate amount of improvement," which was the poorest rating received by the students under the test. (Pl's Evidentiary Submission, Ex. A-6.)

To prove her effectiveness at UNA and her community service, Dr. Brown submitted committee meeting minutes from 1999 and 2000 that showed she had attended some committee meetings.  However, this evidence does nothing to challenge the RRP Committee's finding in November 1998 that Dr. Brown had missed or had been late for several Nursing Committee meetings.  The Nursing Committee minutes that Dr. Brown has submitted for years 1996-98 show that she attended only a smattering of nursing committee meetings during that period of time (six in 1998;  two in 1997; and one in 1996).  (*Id.*, Ex. 7.)  Plaintiff's evidence lends credence to the finding of the RRP Committee and confirms Dr. Brown's statement in her complaint that she "was late or missed" several Department meetings. (Compl. ¶ 23.)  In contrast, the RRP Committee found that Dr. Rowe actively participated on both UNA and Nursing committees and that she was involved in the community.  Plaintiff has not presented any evidence in opposition to that finding.

Dr. Brown admits that she has not done research in her field in several years and that she has never published any articles of substance in her field. (Brown Dep. at 149-50.)  Dr. Rowe's portfolio shows that in December of 1997, less than a year before the RRP Committee met in November of 1998, Dr. Rowe published, copyrighted, and defended her dissertation:  *"The Experience of Hearing Loss in Older Women:  Patterns of Human Becoming."* (Wilson Decl. Ex. 3, at 4.)

Plaintiff argues that the College of Nursing's promotion process is "flawed and fraught with discriminatory practices." (Pl.'s Brief at 3.)  These conclusory allegations, without evidentiary

17

support, do not create a genuine issue of fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir.1997) (holding that conclusory allegations, without more, are insufficient to withstand summary judgment). The undisputed evidence reveals that the RRP Committee, and those who reviewed its findings, relied on legitimate criteria in making its promotion decisions. Plaintiff has offered nothing to challenge those findings.

### (a)   Dr. Brown Cannot Substitute Her Own Criteria for Promotion

Dr. Brown essentially disagrees with the criteria used by the committee. She argues defendant should have promoted her based upon her years of service. (Brown Dep. at 161, 223.) Dr. Brown cannot survive summary judgment merely by substituting her own criteria for the actual criteria used by defendant. The Board "alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them." *See Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000). The Eleventh Circuit consistently applies this rule:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000)). Teaching effectiveness, scholarly or creative performance and university and community service are factors that "might motivate a reasonable employer" in its promotion decisions. *See id.*

The Board's reasons for the selection of Dr. Rowe for promotion, through the findings of the RRP Committee, Dean Wilson and Dr. Strong have been clearly stated and have not been disputed

by Dr. Brown.  Where, as here, the employer provides "clear and reasonably specific" reasons for

its actions, the employer is entitled to summary judgment unless the plaintiff can prove the stated

reasons are a pretext for discrimination.  *Chapman*, 229 F.3d at 1034.

While Dr. Brown may argue more weight should have been given to years of experience, it

is not proper for plaintiff or this court to substitute plaintiff's or its own criteria for promotion.  *See,*

*e.g., Lee*, 226 F.3d at 1254 ("an employee's own opinions about his . . . qualifications [do not] give

rise to a material factual dispute. . . ." (citations and quotations omitted)); *Damon v. Fleming*

*Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999) (courts "are not in the business of adjudging

whether employment decisions are prudent or fair.  Instead, [their] sole concern is whether unlawful

discriminatory animus motivates a challenged employment decision"), *cert. denied*, 529 U.S. 1109

(2000).  Dr. Brown has failed to present any evidence to challenge the Board's reason for denying

her request for promotion under the specified criteria, and, therefore, the Board is entitled to

judgment as a matter of law.

### (b)     Plaintiff Failed to Prove She Was Substantially More Qualified than Her Comparator

An employee can prove pretext in the promotion context by proving she is "substantially

more qualified than the person promoted."  *Lee*, 226 F.3d at 1254.  "'[D]isparities in qualifications

are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are

so apparent as virtually to jump off the page and slap you in the face.'"  *Id*. (quoting *Deines v. Texas*

*Dept. of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)).

> "[J]ump off the page and slap [you] in the face" . . . should be understood to mean
> that disparities in qualifications must be of such weight and significance that no
> reasonable person, in the exercise of impartial judgment, could have chosen the
> candidate selected over the plaintiff for the job in question.  This evidentiary
> standard does not alter the plaintiff's evidentiary burden to prove the fact of

intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact.

*Id.*

Dr. Brown does not contend she was substantially more qualified than Dr. Rowe for promotion but maintains that they were *equally* qualified. (Brown Dep. at 153-54.) A showing of equal qualifications is not enough to prove pretext. "When two candidates are equally qualified in that they both possess the objective qualifications for the position and neither is clearly better qualified, it is within the employer's discretion to choose among them so long as the decision is not based on unlawful criteria." *Id.* (quoting *Simms v. Oklahoma Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1329-30 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999)).

Dr. Brown has not challenged defendant's stated criteria as unlawful. Dr. Brown's belief that she and Dr. Rowe were equally qualified for promotion is not sufficient to survive summary judgment under the case law of this Circuit, particularly given that Dr. Rowe sought promotion to a lesser position.

## C.     Plaintiff's Racial Harassment Claim

To establish a racially hostile work environment in violation of Title VII, a plaintiff has to prove: (1) she belongs to a protected group; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment was severe or pervasive enough to alter a term or condition of employment; and (5) a basis for holding the employer liable. *See Mendoza v. Borden, Inc.* 195 F.3d 1238, 1244-45 (11th Cir. 1999). Dr. Brown has failed to meet at least two of her required elements of proof. First, she has failed to present any evidence that the conduct

about which she complains was directed at her because of her race. Second, she has failed to present evidence that the conduct about which Dr. Brown complains was sufficiently severe or pervasive to give rise to a Title VII racial harassment claim.

### 1.   Evidence that Alleged Harassing Conduct Was Based on Race

The Eleventh Circuit has held that a plaintiff must present evidence that the allegedly harassing behavior was based on the protected characteristic at issue to survive summary judgment. Specifically, the Eleventh Circuit states that:

> the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076 (2001). Further, "unintentional" discrimination, as the plaintiff apparently asserts, does not give rise to a disparate treatment claim as asserted by the plaintiff. *See EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1268 (11th Cir. 2000) (noting difference between disparate treatment discrimination, which requires proof of discriminatory intent, and disparate impact discrimination, which does not require proof of discriminatory intent).

Dr. Brown has not presented any evidence that the conduct about which she complains was directed at her because of her race. No one in UNA administration or in the College of Nursing has displayed any type of racial animus to her. (Brown Dep. at 122-23.) She does not contend anyone in UNA administration or in the nursing department made any racial slurs or derogatory remarks to her about black people. (*Id.*) In fact, Dr. Brown is not even sure she has been treated differently because of her race; she just feels she has been treated differently and it is "perhaps" because of her race, or some other factor, such as her age. (*Id.*) Dr. Brown's failure to offer any evidence of

intentional discrimination based on race is fatal to her claims.  *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (holding that plaintiff's claims must be dismissed, even where plaintiff shows different treatment, if plaintiff fails to present any evidence that difference in treatment was based on race); *see also Gupta*, 212 F.3d at 583 ("[S]tatements and conduct must be of a [race-related] nature . . . before they are considered in determining whether the severe or pervasive requirement is met").

### 2. Evidence that Alleged Harassment Was Severe or Pervasive

To give rise to a claim under Title VII, the conduct complained of must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.  *Gupta*, 212 F.3d at 583.  This "is the element that tests the mettle of most . . . harassment claims." *Id.*  To be actionable, the environment must be one that a reasonable person would find hostile and abusive. *See Mendoza*, 195 F.3d at 1246.

This court must determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).  The standards for judging hostility are sufficiently demanding to ensure Title VII does not become a "general civility code."  *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U. S. 75, 80 (1998).

22

Dr. Brown did not endure a workplace that was sufficiently abusive to survive summary judgment. Only two incidents[6] of alleged harassment occurred within the 180-day period prior to the filing of Dr. Brown's EEOC charge and those incidents are not severe or pervasive enough to give rise to a hostile work environment claim. Also, Dr. Brown cannot rely on evidence of the alleged "attack" or someone watching her door to support her harassment claim because she testified that she was unaware that she was being watched. *See Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000) ("for alleged incidents of racism to be relevant to showing the severity or pervasiveness of the plaintiff's hostile work environment, the plaintiff must know of them.").

The allegations of harassment outside the 180 day period include the alleged harassment by Sue Bobeck in 1994 or 1995; plaintiff's removal from the Helen Keller Hospital in November 1997; the alleged door watching "attack" prior to December of 1997; the incident in which the secretary placed the note under plaintiff's door and completed leave forms for her in the Spring of 1998; and, the alleged harassing conduct by Dean Wilson (i.e., the finger pointing incident, the "things are going to change" incident, plaintiff's scheduling conflict with faculty meetings) in the Fall of 1998. The court has considered these events collectively,[7] and found that plaintiff has not demonstrated that the "harassment" exceed the required threshold level of severity and pervasiveness. At most, the evidence shows Sue Bobeck criticized her for not completing a project, the secretary for the department completed some leave forms for her and asked if she needed help with her beeper, and

---

[6] The incidents include Phyllis McGinnis volunteering to replace the batteries in Dr. Brown's beeper and Dean Wilson restructuring her teaching assignment in the Spring 1999 Semester.

[7] *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. ____, 122 S. Ct. 2061, 2074-75 (2002) (holding that consideration of the entire scope of a hostile environment claim, including behavior alleged outside the statutory time period, is permissible for the purpose of assessing liability).

Dean Wilson criticized her on two occasions for not properly assisting her students and changed her teaching assignment.

Dr. Brown's allegations of isolated and sporadic incidents of "ordinary tribulations of the workplace" fall short of what is required to show an objectively hostile work environment. *Faragher*, 524 U.S. at 788. *Compare Gupta*, 212 F.3d at 583 (finding plaintiff's complaints about trivial workplace incidents not sufficiently severe or persuasive to establish hostile work environment claim) *with EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068-69 (11th Cir. 1990) (finding that racial slurs spoken by co-workers were so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility") and *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (finding that an atmosphere violated Title VII where personnel's use of racial slurs and other racially abusive language was repeated, continuous and prolonged despite plaintiff's objections). Based on the foregoing the court finds that defendant's Motion for Summary Judgment is due to be granted as to plaintiff's hostile work environment claim and such claim is due to be dismissed.

**D.      Plaintiff's Retaliation Claim**

Plaintiff has not established a prima facie case of retaliation because she was not subjected to an adverse employment action and she has not shown a causal connection between defendant's actions and her filing of an EEOC charge in 1994. Even if Dr. Brown had established a prima facie case, she has not offered evidence on which a reasonable jury could find that defendant's legitimate, nondiscriminatory reasons for its actions were a pretext for unlawful retaliation.

### 1.   Plaintiff Has Not Established a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, a plaintiff must show:  (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  *See Bass v. Board of County Commr's*, 256 F.3d 1095, 1117 (11th Cir. 2001).  Dr. Brown engaged in protected activity when she filed an EEOC charge alleging discrimination in 1994.  Nonetheless, Dr. Brown failed to make a sufficient showing on the other two elements of her prima facie case.

### (a)   Plaintiff Was Not Subjected to a Cognizable Adverse Employment Action

None of the incidents about which Dr. Brown complains are "objectively serious and tangible enough" to give rise to a retaliation claim.  *See Gupta*, 212 F.3d at 587 (holding that five of eight of the employment actions at issue were not "adverse employment actions" for purposes of Title VII).

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee. . . .  Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause.  . . ."  In evaluating what actions meet that required level of substantiality, we recognize that "Title VII [] is neither a 'general civility code' nor a statute making actionable the ordinary tribulations of the workplace."  Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined . . . using both a subjective and an objective standard.

*Id.* at 587 (citations omitted); *see also Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show *serious and material* change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances.")

Here, Dr. Brown complains that she was not assigned to teach a desired class (Nursing 411). However, "[a] university can assign its professors to teach the classes it needs them to teach," and professors are not "entitled . . . to cherry-pick the classes" that they teach. *Gupta*, 212 F.3d at 588. Further, Dr. Brown's move from the Nursing 411 class into the clinical setting does not constitute adverse employment action.   The undisputed evidence shows that the change did not affect plaintiff's pay or her prospects for advancement; she was eligible for promotion under the same criteria as all other professors. (Wilson Decl. ¶ 10.) The denial of a request for a preferred teaching assignment is not an adverse employment action protected by Title VII. *Gupta*, 212 F.3d at 588.

Dr. Brown's allegation that she was harassed "when she arrived at work or faculty/staff meetings" apparently relates to someone allegedly watching her door and the scheduling of staff meetings at a time she felt was inconvenient for her.  Dr. Brown admits no one reprimanded or verbally warned her about missing her office hours or her attendance.  (Brown Dep. at 79-80.)  She also had permission to dismiss clinical classes early to attend faculty meetings.  (*Id.* at 257.)  To the extent plaintiff seeks to assert a retaliation claim based upon the other incidents about which she complains in her harassment claim, none of these incidents, alone or together, constitute an adverse employment action.   None of the incidents about which Dr. Brown complains altered her compensation, terms, conditions, or privileges of employment, deprived her of employment opportunities, or affected her status as an employee. *See Davis*, 245 F.3d at 1239; *Gupta*, 212 F.3d at 557.

### (b)   Plaintiff Has Offered No Evidence of a Causal Connection

Assuming the actions about which Dr. Brown complains were sufficiently adverse to support her retaliation claims, those claims still fail because she has not presented evidence of a causal

26

connection between actions and her 1994 EEOC charge. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, *and* that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. BellSouth*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta*, 212 F.3d at 590) (internal quotations omitted; emphasis added). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Id.* at 716-17 (quoting *Bass*, 256 F.3d at 1119).

No one at UNA made disparaging remarks to Dr. Brown about her charge or complaints of discrimination in 1994. (Brown Dep. at 123-24.) As with her discrimination claims, Dr. Brown is not even sure herself if she thinks filing an EEOC charge had anything to do with UNA's actions. (*Id.* at 214.) In any event, the length of time between filing the charge and the alleged adverse employment actions - three or four years - is too attenuated to create the requisite causal connection. Absent some other evidence, a period of time longer than a few weeks or months is insufficient evidence to establish a causal connection. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-75 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . . . Action taken 20 months later suggests, by itself, no causality at all."); *see also Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001)(citing cases). Based on the analysis in *Clark*, the three or four year gap between plaintiff's filing of an EEOC charge and the alleged adverse employment actions that occurred in 1998, is far too great to give rise to any inference of a causal connection. Therefore, her retaliation claim must be dismissed.

**E.    Plaintiff Has Failed to Challenge UNA's Reasons for Its Actions**

Even if the court assumes Dr. Brown has established a prima facie case of disparate treatment on the basis of race or retaliation, she has failed to present any evidence challenging the validity of the reasons offered by the Board for its actions. The court previously addressed Dr. Brown's denied promotion. Dr. Brown also complains about her move from the Nursing 411 class. The undisputed evidence reveals that Dean Wilson made that decision because students were having difficulty understanding the material presented by Dr. Brown, plaintiff failed to update her course material, and Dr. Brown's students had not performed well on the RN Certification tests in areas she taught. (Davis Decl. ¶ 9; Wilson Decl. ¶ 10.) Dr. Brown admits she received poor evaluations from students for her Nursing 411 class, and she also knew a neutral, external accreditation committee criticized her curriculum as outdated. (Brown Dep. at 39-40, 42.)

Finally, any claim based upon Dr. Brown's move from the Helen Keller Hospital is time-barred. *See Thomas*, 24 F.3d at 150. In November 1997, plaintiff's students were placed in nurse-managed care facilities, and she believed the move was discriminatory when she learned of the decision. (Brown Dep. at 186, 213-15.) Therefore, the time for filing a charge concerning any such claim began to run at that time, and her claim is now barred. *See Thomas*, 24 F.3d at 150. Nonetheless, the plaintiff's own testimony reveals the decision to remove her was based on legitimate, nondiscriminatory reasons. Dr. Brown believes she was moved out of Keller Hospital because her relationship with the Director of Nursing had gone "downhill" after a heated discussion about a student. (Brown Dep. at 189-90.) Further, Dr. Brown does not dispute that the nursing faculty wanted the students to get nursing experience in alternative health care settings, such as nurse-managed clinics, due to the changing health care environment. (*Id.* at 201-02.)

28

Dr. Brown's only evidence in opposition to defendant's reasons for its actions is her own subjective belief of a conspiracy to treat her differently. This is insufficient to survive summary judgment. *See Chapman*, 229 F.3d 1012; *see also Baltazor v. Holmes*, 162 F.3d 368, 377 n.11 (5th Cir. 1998) ("A subjective belief alone is insufficient to create a jury question.").

## IV. CONCLUSION

The court concludes that no genuine issues of material fact exist herein, and defendant is entitled to judgment as a matter of law on all claims asserted by the plaintiff. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Opinion.

**DONE** this 26th day of September, 2002.

Sharon Lovelace Blackburn
**SHARON LOVELACE BLACKBURN**
United States District Judge

29